UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SAFEALDEAN ALUSI              §
                              §
v.                            §      CIVIL NO. 4:22-CV-397-SDJ
                              §
CITY OF FRISCO, TEXAS         §

## MEMORANDUM OPINION AND ORDER

Plaintiff Safealdean Alusi alleges that Defendant City of Frisco, Texas ("the City") discriminated against him in various ways, ultimately leading to his wrongful termination. Before the Court is the City's Motion to Dismiss and Brief in Support. (Dkt. #10). The Court, having reviewed the motion, the relevant briefing, and the applicable case law, **GRANTS in part**.

## I. BACKGROUND

Plaintiff Safealdean Alusi previously worked for the City of Frisco, and more specifically, the Frisco Fire Department. (Dkt. #1 at 4 ¶ 16). After completing a one-year probationary period, Alusi became a permanent firefighter and emergency medical technician ("EMT") in December 2018. (Dkt. #1 at 4 ¶ 16). However, by July 11, 2019, Alusi had received three "performance note[s]" in response to various instances of alleged deficient performance, and was shortly thereafter moved to a new station, as well as required to restart a training program "to improve his paramedic skills." (Dkt. #1 at 5 ¶¶ 20–21). Between the fall of 2019 and the summer of 2020, Alusi alleges that he was subject to a hostile work environment, and asserts that he was impermissibly terminated on May 6, 2020, on account of (1) disparate treatment based on his national origin (Iraqi), in violation of Title VII, (2) in retaliation for

engaging in protected activity under Title VII (reporting that he was subject to a "hostile work environment"), and (3) in retaliation for filing workers' compensation claims in violation of Texas Labor Code § 451.001 (of which Alusi had filed three). (Dkt. #1 at 13 ¶ 50, 27 ¶ 117, 27–28 ¶ 121, 29 ¶ 130). Alusi also alleges that the City violated his Fourteenth Amendment Equal Protection rights under 42 U.S.C. § 1983. (Dkt. #1 at 29 ¶ 127).[1] The City has moved to dismiss all of Alusi's claims asserted against it. (Dkt. #10).

## II. LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a favorable probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [his] claims . . . across the line from conceivable to

---

[1] Alusi also asserted claims against five individual defendants; however, those claims have all been dismissed pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Dkt. #17).

plausible," a court draws on its own common sense and judicial experience. *Id.* at 679–80 (second alteration in original) (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

### III. DISCUSSION

At the outset, even though unchallenged by the City, the Court notes that Alusi has properly exhausted his Title VII claims by filing a Charge of Discrimination with both the Texas Workforce Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC") on July 27, 2020, well within the requisite filing period mandated by statute. *See* 42 U.S.C. § 2000e-5(e)(1) (requiring a charge of discrimination to be filed "within three hundred days after the alleged unlawful employment practice occurred" in cases where "the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof"); *see also Griffin v. City of Dallas*, 26 F.3d 610, 611–12 (5th Cir. 1994) (holding that simultaneous filing of claims with a State agency and the EEOC triggered the three hundred day filing provision 42 U.S.C. § 2000e-5(e)(1)). And in any event, as the City has not challenged whether Alusi properly exhausted his Title VII claims, any such argument is forfeited. *See Fort Bend Cnty., Tex. v. Davis*, 139 S.Ct. 1843, 1851–52, 204 L.Ed.2d (2019) (holding that Title VII's exhaustion requirement was a forfeitable claim-processing rule).

## A. Disparate Treatment Discrimination in Violation of Title VII

### i.  Hostile Work Environment Claim

Alusi argues that the City harassed him by creating "a hostile work environment based on his national origin." (Dkt. #1 at 27 ¶ 118). Hostile work environment claims arise where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) (simplified) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

There are five elements a plaintiff must show to prevail on a hostile work environment claim: (1) that he belongs to a protected group; (2) that he was subject to unwelcome harassment; (3) that the harassment complained of was on account of plaintiff's protected status; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that plaintiff's employer knew or should have known of the harassment and failed to take prompt remedial action. *Id.* at 399–400. "In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (simplified). The Supreme Court has instructed that the instances of unlawful employment practice that comprise a hostile work environment must occur "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment

may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Here, Alusi has alleged a course of conduct that occurred during his employment with the Frisco Fire Department, beginning in September 2019, and continuing through his termination date of May 6, 2020, that plausibly states a hostile work environment claim and avoids dismissal under Rule 12(b)(6). Alusi asserts that, during this period of time, he was treated differently and in an adverse manner than other firefighters, that he was continually demeaned and harassed by his supervisor, given unnecessary assignments that no other firefighter had been assigned, was accosted by his peers with his supervisor having knowledge of these interactions, and was subjected to hardships in training exercises that he alone was required to bear.

Alusi began his employment with the City of Frisco's Fire Department in December 2017. After completing a probationary period, he became a Firefighter/EMT in December 2018. From his complaint, it appears that Alusi complains of problems beginning in July 2019. At that time, Alusi was assigned to Fire Station 6, where he alleges an incident in which a Lieutenant FF Watkins required Alusi to pull hose off of a fire engine during a heat advisory, and that he was the only Station 6 firefighter required to perform the drill. Alusi felt that he was being "targeted by the Station 6 crew" and, in September 2019, he complained to Battalion Chief Jeff Morrison that he was experiencing a "hostile environment" at Station 6. Alusi maintains that although Morrison assured him that their meeting would be

confidential, it became clear that Morrison disclosed Alusi's complaint to the Frisco Firefighter Association and the other firefighters, such that Alusi was considered to be a "rat."

Following Alusi's complaint to Morrison about his treatment at Station 6, three events occurred in September 2019. First, Morrison advised Alusi that he would no longer be permitted to participate on the Wildland Firefighting Team. According to Alusi, Morrison had not revoked the permission of any other firefighter to participate on the Wildland Firefighting Team. Second, Alusi had expressed interest in serving on the CORE Employee Recognition Committee, a committee responsible for nominating a City employee of the month. In September 2019, Alusi learned that Frisco Fire Chief Mark Piland declined to allow Alusi to participate on the committee. According to Alusi, Piland had not declined any other firefighter's participation on this committee. Finally, in late September Alusi was informed that Morrison had revoked Alusi's previously approved request to travel with the Frisco Fire Honor Guard on October 6, 2019. Alusi was later informed that Morrison also would no longer permit Alusi to participate in the Honor Guard so that Alusi could focus on his new duties as a Paramedic in Charge. According to Alusi, Morrison had not taken similar actions for other firefighters who assumed Paramedic in Charge duties.

In early October 2019, Morrison transferred Alusi to the "A Shift" at Station 7. At that time, Clint Carpenter was Captain of the A-Shift at Station 7. In his first meeting with Carpenter in October 2019, Alusi asserts that Carpenter told Alusi that Alusi had a "spotlight" on him because of the "problems" Alusi caused at Station 6 by

reporting a hostile environment to Battalion Chief Morrison, and that Carpenter advised Alusi that he (Carpenter) was disappointed that he was losing Firefighter Gibson to another station so that Alusi could be transferred to Station 7. Alusi notes that all of the firefighters referenced in his complaint, including Watkins, Morrison, Carpenter, and Gibson, were not of Iraqi national origin.

Carpenter assigned Alusi to be Paramedic in Charge on the ambulance for Station 7, a position Alusi describes as "one of the lowest ranking positions in the Fire Department" and one with "the highest exposure to reprimands and terminations." Alusi further alleges that Carpenter made Alusi solely responsible for cleaning the entire Station 7 every shift and informed the other Station 7 crew members that Alusi was solely responsible for this duty. According to Alusi, he was the only firefighter required to clean the station by himself.

Around the same time, in early October 2019, both Morrison and Carpenter complained of irregularities in how Alusi had taken vacation time together with sick leave, and required Alusi to provide doctor's notes any time that he requested sick leave. Carpenter further advised that Alusi was also required to first call Carpenter before he would be permitted to call in sick. According to Alusi, neither Morrison nor Carpenter imposed these requirements on any other firefighter.

Alusi goes on to allege that another firefighter assigned to the A-Shift at Station 7, Justin Peebles, had a personal bathroom. Alusi asserts that Peebles "refused to permit Alusi to use his personal bathroom, though Peebles permitted the other Station 7 crew members (none of whom are of Iraqi national origin) to use his

personal bathroom," and that Peebles "required Alusi to clean bowel movement splatter under the toilet seat of Peebles's personal bathroom."

In November 2019, on Thanksgiving Day, Carpenter allegedly "required Alusi to stay outside in the cold temperatures to oversee the frying of a turkey for the Station 7 A-Shift—even though Carpenter knew that Alusi did not eat turkey." Alusi also asserts that Carpenter "required Alusi to clean the dinner plates of the other Station 7 A-Shift crew members, who were permitted by Carpenter to relax and watch movies." Carpenter also required Alusi "to perform the same menial and demeaning tasks on Christmas Day of 2019 but permitted the other Station 7 A-Shift crew members to relax."

Sometime in November or December 2019, "Carpenter requested that Alusi individually label items such as toilet paper and Lysol in Station 7's storage closet," even though such labelling "was not necessary." According to Alusi, Carpenter did not ask any other Station 7 crew members "to perform the menial and unnecessary task of labelling items on the storage rack."

In November 2019, A-Shift firefighter Joao Cabral is alleged to have asked Alusi if he considered joining another fire department because the Frisco Fire Department "might not be the right fit" for Alusi, with Cabral further noting that he and the other Station 7 A-Shift firefighters were "very upset" that Alusi's transfer into the unit resulted in Firefighter Gibson being transferred out of the unit. In addition, sometime in December 2019, at the hands of his fellow firefighters, Alusi was subjected to a racial slur ("Yella, Yella") and intrusive questioning concerning

his religious faith (Muslim). According to Alusi, he had experienced similar issues earlier in the year. In May 2019, a "Captain Stout" had instructed Alusi to stand next to "African American Firefighter Stanford," and, after comparing their arm color, Stout stated that Alusi was "blacker than Stanford," which offended Alusi. And in June 2019, another firefighter (identified as Firefighter Oler) "made disparaging comments about people of Middle Eastern origin and claimed that all Muslims are terrorists." Alusi, who is "Middle Eastern and part Muslim," was highly offended by these comments. Again, Alusi notes that all of the firefighters referenced in his complaint, including Peebles, Cabral, and Oler, are not of Iraqi national origin.

Alusi next alleges that in January 2020, during a training exercise conducted in full gear, Carpenter had approved a request by one of Alusi's fellow firefighters to "turn[] off the valve on Alusi's Self-Contained Breathing Apparatus," causing Alusi to experience near suffocation and to not complete the training exercise. Following this incident, while Alusi was cleaning in the kitchen, three of his fellow firefighters "blocked the kitchen doors so that Alusi was not permitted to leave" and "verbally attacked Alusi and questioned his abilities as a firefighter." On February 2, 2020, "Carpenter told Alusi that the Station 7 A-Shift crew members did not trust Alusi, and that Carpenter himself had concerns about Alusi." Then, on February 14, 2020, Carpenter ordered Alusi to engage in a training exercise that resulted in Alusi getting injured, with Alusi claiming that Carpenter had never instructed any other firefighter to perform that same exercise. Following this injury, Alusi was placed on medical leave pursuant to a workers' compensation claim. Alusi further alleges that

Carpenter interfered with his recovery by directing him to rely on a medical professional that provided inaccurate diagnoses of his injury.

Alusi returned to work on April 6, 2020. However, Alusi claims that before he returned, beginning on March 2, 2020, Fire Chief Piland empowered Sergeant Kevin Putman to begin an investigation into a non-profit animal rescue organization run by Alusi. This investigation resulted in Alusi receiving, the day following his return from medical leave, a professional standards "Charging Letter" from Sergeant Putman concerning certain of Alusi's allegedly improper dealings and conduct in connection with his non-profit. Specifically, Alusi had a dispute with an Animal Control Officer with the City of Temple concerning the adoption status of one of the dogs associated with his non-profit. The City alleged that Alusi's conduct in connection with this dispute violated various City policies, and that Alusi's actions brought "discredit to the City," comprised "insubordination and/or disgraceful conduct," and that Alusi's conduct "could have an adverse effect on the City or on the confidence of the public in the integrity of the City government." Alusi contends that due to the investigation, he had been "under surveillance since March 17, 2020," and that following his return to work, he was interviewed twice in connection with the investigation. According to Alusi, Sergeant Putman "had not interrogated, investigated, or questioned the side businesses of any other City of Frisco employees." Following the investigation, on May 4, 2020, "Chief Piland issued to Alusi an 'Intent to Terminate,'" which resulted in Alusi's termination on May 6, 2020.

Altogether, Alusi has sufficiently pleaded a continued course of conduct beginning in 2019 and continuing through his termination in 2020, sufficient to plausibly state a hostile work environment claim for the purposes of Rule 12(b)(6). Starting before his arrival to the A-Shift at Station 7 and continuing on through his termination, Alusi alleges that he endured offensive comments related to his national origin, was treated differently and unfairly compared to his peers, was repeatedly demeaned and harassed by his colleagues and supervisor, given unnecessary assignments that no other firefighter had been assigned, was accosted by his peers with his supervisor having knowledge of these interactions, and was subjected to hardships in training exercises that he alone was required to bear. To be sure, as this case proceeds Alusi will be required to submit evidentiary support for each of the allegations underlying his hostile work environment claim for that claim to move forward. But at this stage of the proceedings, Alusi's pleadings are sufficient to survive Rule 12(b)(6) scrutiny.

For all of these reasons, the Court will deny the City's motion as it relates to Alusi's hostile work environment national origin discrimination claim.

### ii. Wrongful Termination Claim

Alusi also alleges that the City "unlawfully discriminated" against him "on the basis of his national origin (Iraqi) and subjected him to illegal disparate treatment by treating him less favorably than employees who are not of Iraqi national origin," asserting that he was terminated for conduct that "no other City of Frisco employees were terminated for." (Dkt. #1 at 26–27 ¶¶ 113, 117). The parties do not dispute that Alusi has pleaded that he has suffered an adverse employment action, as all agree

that Alusi was terminated by the City on May 6, 2020. (Dkt. #1 at 26 ¶ 110); (Dkt. #10 at 1). The City instead argues that "Plaintiff does not, and cannot, state a *prima facie* case of discrimination because he does not allege that [the City] treated a non-protected comparator differently with 'nearly identical circumstances' to Plaintiff[]." (Dkt. #10 at 10).

Contrary to the parties' arguments, "there are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an adverse employment action (2) taken against a plaintiff *because of* her protected status." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (simplified) (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).[2] As such, Alusi is not required to plead a prima facie case of discrimination in order to survive a Rule 12(b)(6) motion. Instead, Alusi is tasked with pleading that an adverse action was taken against him "because of" his protected status, which here, is his Iraqi national origin.

---

[2] The City argues, and Alusi does not contest, that at the Rule 12(b)(6) stage, Alusi was required to "plead and establish a *prima facie* case of discrimination." (Dkt. #10 at 9). However, at the pleading state, Alusi bears no such burden, as the prima facie case contemplated by the *McDonnell Douglas* burden-shifting framework is an evidentiary standard, not a pleading requirement. *See Raj*, 714 F.3d at 331 ("Although Raj does not challenge the district court's interpretation of his pleading burden, we nonetheless note that a plaintiff need not make out a prima facie case of discrimination in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim. Inasmuch as the district court required Raj to make a showing of each prong of the prima facie test for disparate treatment at the pleading stage, the district court erred by improperly substituting an 'evidentiary standard' for a 'pleading requirement.'" (citations omitted) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Court concludes that Alusi has sufficiently pleaded that an adverse employment action was taken against him because of his national origin. As noted herein, *see supra* Section III.A.i, Alusi's complaint details numerous specific instances where Alusi alleges that he was treated differently from his peers on account of his Iraqi national origin, including: (1) that in July 2019, Alusi was required to pull hose off a firetruck during a heat advisory while no other firefighter was required to perform the drill; (2) that in October 2019, Alusi was made solely responsible for cleaning the fire station; (3) that in October 2019, Alusi was burdened with procedural requirements for obtaining sick leave that no other firefighter was required to comply with; (4) that from October 2019 through his termination, Alusi was not allowed to use Firefighter Peebles's personal bathroom, even though other firefighters were allowed to use Firefighter Peebles's personal bathroom; (5) that in October 2019, Alusi was removed from the Frisco Fire Honor Guard to focus on his Paramedic in Charge duties, even though no other firefighter had been removed from their special team because they were new Paramedics in Charge; (6) that in November 2019, Alusi was accosted by three of his colleagues, with Alusi's supervisor having knowledge of and at least implicitly approving of this encounter; (7) that across November and December 2019, Alusi was made to clean holiday dinner plates while his colleagues were permitted to relax; (8) that around November/December, Alusi was tasked with unnecessary labelling assignments that no other firefighter had been given; (9) that in January 2020, Alusi's supervisor approved one of Alusi's colleagues' request to turn off the valve on Alusi's breathing apparatus during a

13

training exercise, causing Alusi to experience feelings of suffocation and to fail the exercise; and (10) that in February 2020, Alusi was ordered to perform an exercise that no other firefighter had been asked to do, with Alusi becoming injured during that exercise.

In addition, Alusi alleges that he was ostensibly terminated for violating certain of the City's policies, but that "no other City of Frisco employees were terminated for violating the City of Frisco and Fire Department policies which the City alleged Alusi violated—even though [other City employees'] conduct more clearly violated these same policies," asserting that one employee caused a vehicular accident after becoming intoxicated, and that another employee engaged in an impermissible sexual affair, but that neither of these employees were terminated, and that neither of these employees were of Iraqi origin. The City responds that the employees Alusi identified are not valid comparators within the context of the *McDonnell Douglas* framework. (Dkt. #10 at 10–11). However, the existence of valid comparators is a determination that is fact-dependent and therefore is not appropriate for resolution at the motion to dismiss stage on the facts of this case. *Cicalese*, 924 F.3d at 768 ("While a close call, we conclude that Cicalese and Rastellini—in claiming UTMB's various actions against them were motivated by anti-Italian bias—alleged sufficient facts to nudge their claims across the line from conceivable to plausible. The district court erred by holding Appellants to a heightened pleading standard. The court's analysis of the complaint's allegations—scrutinizing whether Appellants' fellow employees were really 'similarly situated' and whether [Appellants' supervisors']

14

derogatory statements about Italians amounted to 'stray remarks'—was more suited to the summary judgment phase. At this stage of the proceedings, a plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss." (quotations and citations omitted)).

Altogether, for the foregoing reasons, the Court will deny the City's motion as it relates to Alusi's wrongful termination national origin discrimination claim.

## B. Retaliation in Violation of Title VII

Alusi also asserts that the City "engaged in continual retaliatory actions against [him] because he opposed unlawful discrimination based on his national origin." (Dkt. #1 at 28 ¶ 122). To assert a viable Title VII retaliation claim, Alusi must plead facts establishing the following: (1) that he engaged in a protected activity under Title VII; (2) that he suffered an adverse employment action; and (3) that there exists a causal link between Alusi's protected activity and the adverse employment action he ultimately suffered. *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 433 (5th Cir. 2021). The City asserts that Alusi's retaliation claim fails at the first step, as it argues that Alusi has failed to plead that he engaged in a protected activity under Title VII. (Dkt. #10 at 7–9). The Court agrees.

"Protected activity is defined as opposition to any practice rendered unlawful by Title VII," *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted), and the Fifth Circuit "has consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity," *Paske v. Fitzgerald*, 785 F.3d 977, 986 (5th Cir. 2015) (simplified). As summarized by Alusi in his response to the City's motion to dismiss, Alusi pleaded

the following allegations concerning the "protected activity" element of his retaliation claim:

> [Alusi] alleges in his Complaint that he reported to Chief Morrison that he was subject to a Hostile Work Environment, on or around September 15, 2019. [Alusi] indicated to Chief Morrison that he was the only Station 6 Firefighter required by Lieutenant FF Watkins to pull hose off Engine 6 during a heat advisory. Furthermore, [Alusi] alleged that Chief Morrison and other members of the Frisco Fire Department were Friends with [Alusi] on Facebook, and consequently, they saw his Iraqi family members and knew he was of Iraqi national origin.

(Dkt. #14 at 9). Although Alusi has alleged that he complained of a hostile work environment to his supervisor, he does not allege that he complained of a hostile work environment based on his national origin, which is a required element for the complaint to serve as the basis of Alusi's Title VII retaliation claim. In this regard, nowhere in the above-cited passage, or in his complaint, does Alusi claim that he told Chief Morrison that he was subject to a hostile work environment *because* of his Iraqi national origin.

The Court finds *Davis v. Dallas Independent School District*, 448 F.App'x 485 (5th Cir. 2011) (per curiam), instructive on this issue. The plaintiff in *Davis*, an African-American female, brought a Title VII retaliation claim premised on a complaint she made, during a contentious and heated meeting, that her supervisor had created a hostile work environment. *Id*. at 493. The district court concluded, and the Fifth Circuit agreed, that the plaintiff's complaint of a hostile work environment created at a confrontational meeting did not constitute "protected activity" within the meaning of Title VII because the complaint "lacked a racial or gender basis." *Id*. ("The only racial component of the entire [] interaction was interjected by [plaintiff] herself,

16

when she referred to [her supervisor] as 'Massa.' [Plaintiff] cannot rely upon her own use of a racially sensitive word to demonstrate that her accusation had racial overtones.").[3] The same reasoning controls here, as Alusi does not allege that his "hostile work environment" complaint included any allegations of national origin discrimination.

Because Alusi has not plausibly alleged that he engaged in "protected activity" under Title VII, the City's motion to dismiss Alusi's Title VII retaliation claim is granted. However, the dismissal of this claim will be without prejudice and Alusi will be permitted to replead this cause of action.

## C. Constitutional Deprivations Under 42 U.S.C. § 1983

Alusi further argues that the City "took actions which intentionally deprived [him] of his equal protection of the laws by discriminating against him on the basis of his national origin." (Dkt. #1 at 28 ¶ 125). The Court concludes that this claim is barred by the applicable statute of limitations, and even if it were timely asserted, it would nonetheless fail on the merits.

### i. Timeliness

"The statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). In Texas, this limitations period is two years. TEX. CIV. PRAC. & REM. CODE § 16.003(a). The parties

---

[3] *See also Harris-Childs v. Medco Health Sols., Inc.*, 169 F.App'x 913, 916 (5th Cir. 2006) (upholding summary judgment on Title VII retaliation claim where the plaintiff did not "specifically complain[] of racial or sexual harassment, only harassment.").

agree that Alusi was terminated on May 6, 2020, and that he did not bring the instant suit until May 7, 2022, two years and one day following his termination. (Dkt. #1 at 26 ¶ 110). Against this plain limitations bar, Alusi argues that his Section 1983 claim is timely filed due to the City's "continuing violations." (Dkt. #14 at 4–5).

"Under the continuing violations doctrine, a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004). But when applying the continuing violation doctrine in employment discrimination cases, the Supreme Court has distinguished "discrete acts that are easy to identify such as termination, failure to promote, denial of transfer, or refusal to hire," from hostile environment claims that involve "repeated conduct and are based on the cumulative effect of individual acts that may not be actionable on their own, such as racial jokes, racially derogatory acts, negative comments regarding the capacity of people of a certain race to be supervisors, and the use of racial epithets." *Doe v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, --- F.Supp.3d ---, 2023 WL 1111832, at *7 (S.D. Tex. 2023) (simplified) (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114–15). "Discrete acts do not implicate the continuing violation doctrine; they 'are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113). Likewise, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 112. Put simply, the continuing

violations doctrine does not apply here because Alusi's termination was a discrete act that occurred on May 6, 2020.

Alusi resists this result, arguing that while he was terminated on May 6, 2020, "Plaintiff's Complaint alleges on its face that on June 29, 2020, Chief Piland responded to Plaintiff's appeal of his termination and upheld it," and that "on August 26, 2020, George Purifoy, the City Manager for the City of Frisco, also denied Plaintiff's appeal and upheld Chief Piland's findings regarding the allegations against Plaintiff and his termination." (Dkt #14 at 4). In Alusi's view, his "termination date" is extended by his internal appeals with the City attempting to undo the termination. Not so. Alusi's unsuccessful pursuit of an internal appeal process does not change the date of his termination. *See, e.g.*, *Perkins v. Starbucks Corp.*, No. 4:21-CV-4189, 2022 WL 17069145, at *5 (S.D. Tex. Nov. 17, 2022) (explaining, under similar circumstances, that "the denial of [plaintiff's] appeal of his termination was, like his termination itself, a single, easily identifiable act that took place on an ascertainable date," and that therefore, his appeal denial "was a discrete act that did not implicate the continuing violation doctrine," such that the continuing violation doctrine did not "save [plaintiff's] claims stemming from his . . . termination or events predating that termination," where the plaintiff's date of termination was outside the two-year statute of limitations). Instead, Alusi's internal appeal of his termination implicates separate and discrete events related to the appeal itself, such as the June 29, 2020, and August 26, 2020, decisions denying Alusi's appeal. Those decisions do not alter or extend Alusi's termination date, which remains May 6, 2020.

Equally unpersuasive is Alusi's contention that the continuing violation doctrine applies because his complaint alleges that "other City of Frisco Employees continued to be employed despite engaging in conduct that more clearly violated the same policies that Plaintiff was terminated for violating," and that "the continu[ed] employment of other employees who engaged in more severe conduct than that which Plaintiff engaged in" constitutes a continuing violation of Alusi's rights. (Dkt. #14 at 4). This argument blinks reality. The limitations period for Alusi's Section 1983 claim began to run upon the discrete act of his own termination. The City's alleged decision not to fire employees who engaged in misconduct similar to Alusi might be relevant to the substance of Alusi's equal-protection claim, but this allegation does not transform the discrete act of Alusi's firing into a continuing violation and likewise does not alter the applicable limitations period.

Because Alusi's Section 1983 claim is time-barred, the Court will grant the City's motion to dismiss this claim.

### ii. Merits

Even if Alusi's Section 1983 claim was not time-barred, it would nonetheless fail on the merits. A municipality is a "person" subject to liability under Section 1983 for violating an individual's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Although a municipality cannot be held liable simply on a theory of respondeat superior, *id.* at 691, it can be held liable if a deprivation of a constitutional right is inflicted because of an official policy or custom, *Piotrowski*, 237 F.3d at 578. Municipal liability requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be

charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

*1. Existence of a policy*

As to the first element of municipal liability, a policy's existence "can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id.* at 542. Although "[a] single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable," this "single incident exception is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Id.* (simplified). A custom is "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quotations omitted). A plaintiff's allegations about the policy or custom cannot be conclusory; they must contain specific facts showing the existence of such policy or custom. *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

The Court concludes that Alusi's complaint fails to make the requisite allegations required to support a Section 1983 *Monell* claim. In his complaint, Alusi identifies no custom or policy whatsoever.[4] Instead, Alusi argues that the following

---

[4] Indeed, Alusi's complaint frames his Section 1983 claim against the City in the same manner as it frames Alusi's now-dismissed Section 1983 claims against certain individual

allegations show that the City had "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy:"

> (1) Denial of participation in the CORE Employee Recognition Committee, (2) revocation of participation in the Wildland Firefighting Team; (3) Investigated for his off-duty side business; [4] Subjected to comments regarding his skin color, his Muslim Faith, his national origin from the Middle East, [] and other offensive comments; and (5) termination of his employment despite the continued employment of other employees whose conduct more clearly violated City policies.

(Dkt. #14 at 7–8) (quotations omitted). However, none of these allegations identifies an official policy. Instead, each of these allegations concerns a discrete decision, unique to Alusi, that Alusi was displeased about. Alusi has failed to connect these decisions to any broader policy or custom of the City or its fire department.

A policy cannot be proven through a series of one-off decisions concerning a single city employee, as Alusi suggests. As the Fifth Circuit has explained, "[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984). "Where prior incidents are used to prove a pattern [evincing a policy], they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quotations omitted).

---

city officials. (Dkt. #1 at 28 ¶ 125) ("As discussed *infra* ¶¶ 1–122, the City of Frisco and Defendants Piland, Carpenter, Morrison, Peebles, and Putnam [sic] (acting under the color of state law while exercising their responsibilities pursuant to state law) took actions which intentionally deprived Alusi of his equal protection of the laws by discriminating against him on the basis of his national origin.").

And critically, the pleaded pattern is required to be specific, so as to allow the inference that the pattern is indeed indicative of an official policy that is giving rise to the pattern observed. "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex re. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005). Without this requisite showing of specificity, Section 1983 liability threatens to collapse into respondeat superior liability, something *Monell* strictly forbids. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights.").

Here, at bottom, Alusi alleges only two distinct harms that the City has caused him: (1) subjection to a hostile work environment; and (2) wrongful termination. Because Alusi does not allege that even a *single* other City employee experienced these harms, and likewise fails to plausibly plead that the discrete decisions he complains of were the result of or were connected to a City policy or custom, the first requirement of *Monell* plainly is not met here. *Compare Liu v. Houston Cmty. Coll.*, No. 4:07-CV-3448, 2009 WL 10736499, at *8 (S.D. Tex. Aug. 26, 2009) (granting summary judgment to defendant where "there is no evidence in the record indicating . . . a persistent, widespread practice of discrimination, retaliation or

hostile work environment" while noting that "a plaintiff must *at least* demonstrate a pattern of similar incidents in which *citizens* were injured," (simplified) (emphases added) (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)), *with Marble v. Navasota Indep. Sch. Dist.*, No. 4:09-CV-00123, 2010 WL 11453634, at *15 (S.D. Tex. Aug. 18, 2010) (denying summary judgment to defendant school district where plaintiff introduced evidence of multiple "*complaints* related to [the school principal's] attitude toward minority students and teachers," including that "the National Association for the Advancement of Colored People had filed *complaints* about discrimination" within the school district (emphases added)), *recommendation adopted*, 2010 WL 11453631 (S.D. Tex. Sept. 2, 2010).

*2. The "final policymaker" exception*

To overcome his pleading deficiencies with respect to alleging a City "policy" under *Monell*, Alusi invokes the "final policymaker" exception, contending that his allegations are sufficient because Fire Chief Mark Piland and Battalion Chief Jeff Morrison were final policymakers, bringing their actions within the scope of *Monell* liability attributable to the City. This argument also fails.

At the outset, the Court notes that Alusi's bald, conclusory assertions that Chief Piland and Battalion Chief Morrison are "policymakers" under the *Monell* inquiry are not "facts" that the Court must view in Alusi's favor. *See, e.g., Groden v. City of Dallas*, 826 F.3d 280, 284–85 (5th Cir. 2016) ("Furthermore, the Supreme Court has repeatedly emphasized that the identity of the policymaker is a question of law, not of fact—specifically, a question of state law." (citations omitted)). The Fifth Circuit has "rejected the line of authority which would permit policy or custom to be

attributed to the city itself by attribution to any and all officers endowed with final or supervisory power or authority." *Bolton v. City of Dallas*, 541 F.3d 545, 549–50 (5th Cir. 2008) (per curiam) (simplified). Instead, the Fifth Circuit has held that where a Texas city "has a city council and a city manager, the state and local law show that the city manager is an executive and administrative official with final decisionmaking authority in certain employment decisions; it does not show that the [city charter] or the city council delegated policymaking power to the city manager." *Id.* at 550 (citing TEX. LOC. GOV'T CODE § 25.029); *see also Groden*, 826 F.3d at 286 (same); *Reynolds v. City of Commerce*, No. 3:19-CV-01577-E, 2021 WL 268819, at *3 (N.D. Tex. Jan. 27, 2021) ("Under Texas law, the final policymaker for a city is the city council."). Given that a city manager's decision-making authority does not equate to final policymaking authority under *Monell*, the same principle applies *a fortiori* to city officials charged with supervising city departments such as a fire department.

Here, Alusi's complaint states that "Defendant the City of Frisco, Texas, is a political subdivision which operates as a home-rule city under the laws of the State of Texas. The City operates under the Council/Manager form of government, with the City Manager as Chief Administrative Officer." (Dkt. #1 at 2 ¶ 7).[5] A Texas home-

---

[5] Alusi is correct on this point. Frisco is a home-rule municipality. *See FLCT, Ltd. v. City of Frisco*, 493 S.W.3d 238, 252 n.10 (Tex. App.—Fort Worth 2016, pet. denied); *City of Frisco v. Comm'n on State Emergency Commc'ns*, 2009 WL 1980932, at *2 (Tex. App.—Austin July 9, 2009, no pet.) (mem. op.). Under Texas law, home-rule municipalities derive their power from the Texas Constitution. *See* TEX. CONST. art. XI, § 5; *State v. Chacon*, 273 S.W.3d 375, 378 (Tex. App.—San Antonio 2008, no pet.). They are essentially "mini-legislatures," with "full authority to do anything the legislature could theretofore have authorized them to do." *Chacon*, 273 S.W.3d at 378 (quoting *Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282, 286 (Tex. 1948); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 26 n.5 (Tex. 2003)). They possess "the full power of self government and look to the [l]egislature not for grants of

25

rule municipality may operate under any form of government, TEX. LOC. GOV'T CODE § 26.021, and as its charter makes clear, Frisco has chosen a "Council-Manager Government," which provides that the Frisco city council is the final policymaker for the City—not the city manager or any other city official, such as Chief Piland or Battalion Chief Morrison. In this regard, the charter states as follows:

> **Form of Government.** The municipal government provided by this Charter, shall be known as the "Council-Manager Government". Pursuant to its provisions, and subject only to the limitations imposed by the state Constitution, the statutes of this state, *and by this Charter, all powers of the city shall be vested in an elective council, hereinafter referred to as the "city council",* which shall enact local legislation, adopt budgets, determine policies, and appoint the city manager, who in turn, shall be held responsible to the city council for the execution of the laws and the administration of the government of the city. All powers of the city shall be exercised in the manner prescribed by this Charter, or if the manner not be prescribed, then in such manner as may be prescribed by ordinance, the state Constitution, or by the statutes of the State of Texas.

City of Frisco Charter § 1.01 (emphasis added). By its own terms, the City of Frisco Charter provides that "all powers of the city shall be vested in an elective council," which is consistent with the applicable principles from *Bolton* and *Groden.*

Finally, Alusi fails to identify any support for the proposition that the Frisco city council somehow empowered either Piland or Morrison to act as "final policymakers" for the City. To the contrary, Alusi points only to Piland's and Morrison's *decision-making authority* as officials within the City's fire department.

---

power, but only for limitations on their power." *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002) (quoting *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993)). They have "all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter." *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007) (quoting *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998)).

In so doing, Alusi mistakenly conflates "policymaking authority with decision-making authority," something Fifth Circuit precedent has consistently "counsel[ed] against." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 217 (5th Cir. 2019) (citing *Valle*, 613 F.3d at 543–44).

* * * *

For all the foregoing reasons, even if Alusi's Section 1983 claim was not time-barred, the Court would nonetheless grant the City's motion to dismiss this claim on the merits.

## D. Retaliation in Violation of the Texas Labor Code

Finally, Alusi claims that the City "discriminated and retaliated against [him] for filing . . . good-faith Workers' Compensation claims when it, *inter alia*, undertook an unwarranted and invasive investigation into [his] off-duty conduct while he was on medical leave pursuant to his 2020 Workers' Compensation claim, and when it terminated [him] within 30 days of his returning to modified duty work with restrictions from his compensable work injuries." (Dkt. #1 at 29 ¶ 130). Addressing Alusi's workers' compensation retaliation claim, the City argues only that Alusi's claims are time barred. (Dkt. #10 at 3–4).

The statute of limitations governing workers' compensation retaliation claims under Texas Labor Code § 451.001 is two years. *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 927 (Tex. 1996) ("A suit for violation of article 8307c [the predecessor to Section 451.001] must be filed within two years after such cause of action accrues."). Like his *Monell* claim, Alusi's workers' compensation retaliation claim was filed outside of the controlling limitations period. *See supra* Section III.C.i

27

(noting that the parties agree "that Alusi was terminated on May 6, 2020, and that he did not bring the instant suit until May 7, 2022, two years and one day following his termination."). However, Alusi argues that he "was not aware that the investigation and his subsequent termination were pretextual until after the date of his termination," such that the "discovery rule" tolled the accrual of his workers' compensation retaliation claim. (Dkt. #14 at 3–4).

"The discovery rule is a narrow exception that is only applied in exceptional cases," *Berry v. Berry*, 646 S.W.3d 516, 524 (Tex. 2022) (quotations omitted), and is permitted only where "the nature of the injury is inherently undiscoverable and the injury itself is objectively verifiable." *AT&T Corp. v. Rylander*, 2 S.W.3d 546, 556 (Tex. App.—Austin 1999, pet. denied) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996)). In the context of workers' compensation retaliation claims, the Texas Supreme Court has made clear that this cause of action "accrues when the employee receives unequivocal notice of his or her termination or when a reasonable person should have known of his or her termination," *Johnson & Johnson*, 924 S.W.2d at 928, and Alusi has cited no case law establishing that the discovery rule is applicable to workers' compensation retaliation claims or in any way alters *Johnson & Johnson*'s clear command. *See Taylor v. State*, No. 11-13-00207-CV, 2015 WL 4522871, at *2 (Tex. App.—Eastland July 23, 2015, pet. denied) ("Appellant cites no cases, and we have found none, where the discovery rule applies to claims for retaliation.").[6]

---

[6] Instead, Alusi cites to *Villarreal v. Williams*, which case concerned the application of the Texas Whistleblower Act's statutorily prescribed discovery rule to claims brought

The Court concludes that the discovery rule is inapplicable to Alusi's workers' compensation retaliation claim, as the nature of the injury is in no way "inherently undiscoverable." The types of injuries which Texas courts have found to be "inherently undiscoverable" include a "lawyer's error [that] could not be discovered by client who was ignorant of the law," medical malpractice "in muscular dystrophy gene screening [that] could not be discovered by parents until [their] child showed symptoms," a "false credit report [that] could not be discovered until credit [was] denied," a man's continued fertility following a failed vasectomy, and the deposit of "a foreign object [that had] been left within the body" of a patient following surgery. *S.V.*, 933 S.W.2d at 6–7 (simplified) (collecting cases). "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitation period despite due diligence." *Id.* at 7.

*Texas Department of Protective & Regulatory Services v. Lynn* is instructive, as in that case, the court held that the discovery rule did not apply to save a former employee's claim of racial discrimination that was otherwise untimely filed. Specifically, *Lynn* held that while the plaintiff had pleaded that she "discovered the race-based motive for her termination" after she was terminated, "such a statement falls short of demonstrating that the nature of [plaintiff's] injury, racial discrimination, was such that it was inherently undiscoverable during the limitations

---

under that statute. 971 S.W.2d 622, 626 (Tex. App.—San Antonio 1998, no pet.). However, Alusi points to no statutorily prescribed discovery rule contained within Section 451.001 of the Texas Labor Code—the basis of his workers' compensation retaliation claim—and as such, *Villarreal* is inapt.

period despite her due diligence. [The plaintiff's] pleadings aver that she did not in fact discover her injury within the limitations period, *but they fail to support the contention that she could not have done so.*" No. 03-04-00635-CV, 2005 WL 1991809, at *7 n.16 (Tex. App.—Austin Aug. 16, 2005, pet. denied) (emphasis added) (citations omitted). Here, as in *Lynn*, while Alusi argues that he "was not aware that the investigation and his subsequent termination were pretextual until after the date of his termination," (Dkt. #14 at 3), nothing in either Alusi's complaint or response to the City's motion to dismiss supports the contention that Alusi *could not have discovered* that he was terminated in retaliation for filing workers' compensation claims. Indeed, Alusi's complaint supports precisely the opposite conclusion, as Alusi pleads that he was aware of the allegedly "unwarranted and invasive investigation into [his] off-duty conduct while he was on medical leave pursuant to his 2020 Workers' Compensation claim," and that he was "terminated within 30 days of his returning to modified duty work with restrictions from his compensable work injuries." (Dkt. #1 at 23 ¶ 100, 25 ¶ 106, 29 ¶ 130); *cf. Villarreal*, 971 S.W.2d at 626 ("The record affirmatively demonstrates that on July 11, appellants were aware they had been terminated, and were aware of the allegedly wrongful nature of the terminations due to the 'temporal proximity' following their whistleblowing activities.").

For these reasons, the Court will grant the City's motion to dismiss Alusi workers' compensation retaliation claim.

## IV. Conclusion

For the foregoing reasons, it is **ORDERED** that Defendant City of Frisco, Texas's Motion to Dismiss and Brief in Support, (Dkt. #10), is **GRANTED in part**. The City's motion is **DENIED** with respect to Alusi's Title VII national origin discrimination claims, and is **GRANTED** as to the balance of Alusi's claims.

It is further **ORDERED** that Alusi's Title VII retaliation claim is hereby **DISMISSED without prejudice**.

It is further **ORDERED** that Alusi's 42 U.S.C. § 1983 claim and workers' compensation retaliation claim under Texas Labor Code § 451.001 are hereby **DISMISSED with prejudice**.

It is further **ORDERED** that the stay entered on April 27, 2023, (Dkt. #26), is hereby **LIFTED**. The Court will separately enter an amended scheduling order.

It is further **ORDERED** that Alusi has **fourteen days** from the date of this order to amend his Complaint.

**So ORDERED and SIGNED this 24th day of August, 2023.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE